IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| VERONICA ROLDAN | § | |
| v. | § | CIVIL ACTION NO. 6:21cv096 |
| DIRECTOR, TDCJ-CID | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Petitioner Veronica Roldan, an inmate of the Texas Department of Criminal Justice proceeding through counsel, filed a petition for a writ of habeas corpus and paid the filing fee. The petition was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Procedural History

Petitioner challenges her 2018 conviction in Panola County, Texas, for aggravated assault. She was indicted on May 27, 2009, for "knowingly or recklessly caus[ing] serious bodily injury" to the victim, Michelle Adams, on or about April 26, 2009. (Dkt. #15-1 at 7.) Petitioner waived formal arraignment and pleaded not guilty on June 23, 2009. (*Id.* at 16.) In an "Announcement of Not Ready" filed by counsel on December 17, 2009, Petitioner observed that the case was set for jury selection to begin on January 25, 2010, and advised the court that she was not ready for trial. (*Id.* at 27.) In a letter submitted by facsimile more than a year later, on April 15, 2011, counsel announced that the defense was ready for trial. (*Id.* at 28.)

On January 14, 2018, after a lengthy unexplained gap in the record, the prosecutor mailed counsel the state's witness list. (Dkt. #15-1 at 30–31.) A notice from the presiding judge dated February

1

6, 2018, advised Petitioner of several upcoming dates in the criminal proceedings, beginning with a docket call set for February 27, 2018, and concluding with a jury trial to begin on June 11, 2018. (*Id.* at 29.) When Petitioner did not appear for the February 27 docket call, a warrant was issued for her arrest. (*Id.* at 32.) On March 23, 2018, Petitioner moved, through new counsel, for release on bail on the basis that she was "innocent of the charges against her and [was] entitled to a bond." (*Id.* at 35.) She was released on bond on March 26, 2018. (*Id.* at 45–46.) She again formally waived arraignment, pleaded not guilty, and agreed to set the case for trial. (*Id.* at 43.) A new scheduling order set the case for a first pretrial conference on April 16, 2018, and for jury trial on June 11, 2018. (*Id.* at 44.) That order was later modified to set the first pretrial conference for July 12, 2018, and a jury trial in September and/or October 2018. (*Id.* at 55.)

On September 13, 2018, not long before trial was expected to begin, Petitioner, through counsel, filed a motion to dismiss the charges against her based on a violation of her right to speedy trial under the United States and Texas constitutions. (Dkt. #15-1 at 58–59.) She observed that the case had been pending for more than nine years since indictment and asserted that there was "no justification for the nine year delay in the trial of this cause." (*Id.* at 58.) She also asserted that the delay had prevented her from being able to locate and interview witnesses and from preparing a defense, through no fault of her own. (*Id.* at 59.) In a subsequent memorandum in support of her motion, Petitioner suggested that some witnesses who were available were now hampered by criminal records or faded memories, though she implicitly acknowledged that none of her attorneys had asserted a right to speedy trial on her behalf until that month. (*Id.* at 78–85.) She also "concede[d] that there may not have been deliberate attempts at delay [by the state] but anticipate[d] the State to cite negligence or court crowding as the reason" for the lengthy delay. (*Id.* at 82.) Her summary of the relevant procedural history of the case was:

> This case was set for a docket on April 30, 2009 and again on April 15, 2011. Then the next docket noted in the file of the District Clerk was February 27, 2018. From a review of the Clerk's file it appears that this case went for almost seven (7) years without even being on a docket, apparently due to a decision of the District Attorney of Panola County.

(*Id.* at 82.) The trial court denied the motion without written explanation on September 20, 2018. (*Id.* at 94.)

The prosecutor sent counsel a lengthy amended witness list, including addresses and some phone numbers, on September 14, 2018. (Dkt. #15-1 at 61–62.) Four days later, Petitioner sought subpoenas for several of those witnesses. (*Id.* at 65–66.) The prosecutor shared yet another amended witness list on September 19, 2018 (*id.* at 75–77), and Petitioner sought more subpoenas on September 24, 2018. (*Id.* at 95–96.) A jury was selected that same day. (*Id.* at 109.)

The jury found Petitioner guilty of aggravated assault on September 26, 2018. (Dkt. #15-1 at 122–30, 132.) On November 1, 2018, the trial court sentenced Petitioner to nine years in the Texas Department of Criminal Justice. (*Id.* at 164.) On November 2, 2018, Petitioner filed both a motion for new trial and a notice of appeal. (*Id.* at 151–55.) The trial court ordered Petitioner released on a $25,000 bond pending appeal. (*Id.* at 156.) It presumably denied the motion for new trial, although the Court has found no written order to that effect in the record.

The Texas Court of Appeals for the Sixth Appellate District of Texas affirmed Petitioner's conviction and sentence on August 29, 2019, ruling against Petitioner on the single claim she raised— that the charge against her should have been dismissed based on the alleged speedy trial violation. (Dkt. #15-14.) It also denied her motion for rehearing on September 17, 2019. (*See* Dkt. #15-18 at 8.) Petitioner sought discretionary review from the Texas Court of Criminal Appeals (Dkt. # 15-18), which was denied on January 15, 2020. (*See* Dkt. #15-24 at 3.) Her request for reconsideration and en banc rehearing was denied on March 25, 2020. (*See* Dkt. #5 at 3.)

3

Petitioner sought state habeas relief on May 5, 2020 (Dkt. #15-27 at 8–44), which the Texas Court of Criminal Appeals denied without written order on July 29, 2020. (Dkt. #15-25.) Nevertheless, the trial court proceeded to designate issues for factual development and to consider briefing and set a hearing on Petitioner's habeas petition. (Dkt. #15-26 at 17.) According to Petitioner, on the date set for the hearing—December 16, 2020—the trial court observed that it lacked jurisdiction to act on the petition because the Texas Court of Criminal Appeals had already denied it. (Dkt. #16 at 4.) On January 14, 2021, the trial court found Petitioner had failed to demonstrate a right to relief and entered written Findings of Fact and Conclusions of Law recommending denial of habeas relief. (*Id.* at 47–58.)

Petitioner filed her federal petition on March 8, 2021, and Respondent does not dispute its timeliness. (Dkt. #14 at 5–6.)

<u>Facts</u>

Respondent's summary of the facts adduced at trial, lifted from the prosecution's summary in state habeas proceedings, is as follows:

> Roldan took the stand in her own defense at trial, admitting that she beat Michelle Adams with her fists until her hands were wet with Adams' blood. Roldan and her then boyfriend John Sholar had attended a party on the evening of April 25, 2009, at the home of one of Sholar's friends. According to Roldan, Michelle Adams and another girl, Brendon Conway, had been goading her, making insulting remarks and calling her a "stupid ass Mexican." Roldan got into shoving matches with the two girls, then left with Sholar.
>
> Roldan and Sholar returned to the party about an hour and a half later. Conway met Roldan at Sholar's car and apologized for the earlier confrontation. But Roldan claimed that Adams continued to provoke her. Roldan testified that Adams, who was intoxicated, was swinging her arms wide; she had a beer can in her hands, and when she swung her arms around, she spilled beer all over Roldan. Roldan admitted that Adams never took a swing at her. But Roldan punched Adams, and Adams hit the ground. According to her own testimony, Roldan got on top of Adams and hit her repeatedly in the face with her fists until her hands were wet with what she later realized was Adams' blood.
>
> Roldan testified that Adams was hitting her back when she was on top of her on the ground. But other witnesses testified that Adams hit the ground unconscious after the

4

first punch and that Roldan was on top of her, beating her about the head and face with her fists. Sholar testified that he had to pull Roldan off Adams by her hair.

Michelle Adams testified "it felt like my face exploded. It felt like I could feel this bone right here crush, and I felt my face crush, and I thought I was dead, and I passed back out." The next thing she knew, Conway was carrying her to the truck to take her to the hospital. Adams suffered multiple broken bones, including a crushed sinus cavity, crushed orbital socket, and broken jaw, as well as frontal lobe brain trauma. She had to have two surgeries to reconstruct the orbital socket and sinus cavity; she will need a third surgery, and possibly more, to repair the nasal cavity. Adams was hospitalized for about a week after the assault; she was initially in a wheelchair then used a walker for the next five or six months.

(Dkt. #14 at 5–6 (citations omitted).)

Petitioner adds that trial testimony established that "Brendon 'B.J.' Conway had earlier that evening physically attacked Roldan and wrestled her to the ground and choked Roldan because Roldan pushed Adams away from her after Michelle Adams had pulled Roldan's hair." (Dkt. #16 at 4.)

### Claims for Relief

The petition raises fifteen grounds for relief:

1.  Petitioner's Sixth Amendment right to a speedy trial was violated. (Dkt. #5 at 11.)
2.  Petitioner's Fourteenth Amendment right to due process was violated in connection with the handling of her petition for state habeas relief by the Panola County court. (*Id.* at 13.)
3.  Petitioner's constitutional rights were violated when a police deputy pressured her into giving a statement without a lawyer present after Petitioner said she wanted to talk to a lawyer. (*Id.* at 15.)
4.  The state suppressed the criminal histories of state witnesses Brendon Conway and Telia Adams. (*Id.* at 17.)
5.  The state suppressed exculpatory law enforcement records. (*Id.* at 19.)
6.  The state suppressed "witness statements, interview records, notes or recordings, photos or videos gathered or created during law enforcement interviews" of witnesses to the fight between Petitioner and the victim. (*Id.* at 21.)
7.  The state suppressed criminal histories and complete contact information for the state witnesses on its second amended witness list. (*Id.* at 23.)
8.  The prosecutor committed misconduct by eliciting testimony that "falsely suggested [Petitioner] used brass knuckles to inflict injury to Michelle Adams when there was no evidence brass knuckles were used." (*Id.* at 25.)
9.  The prosecutor committed misconduct in closing argument by referring to evidence not in

the record and offering her own testimony. (*Id.* at 27.)

10. The prosecutor committed misconduct by questioning defense witness Sholar about his inadmissible criminal history. (*Id.* at 29.)

11. Trial counsel was ineffective for failing to move to exclude state witnesses for whom the prosecution did not provide criminal histories. (*Id.* at 31.)

12. Trial counsel was ineffective for failing to object to evidence that Sholar was a registered sex offender. (*Id.* at 33.)

13. Trial counsel was ineffective for failing to object, seek a curative instruction, and move for mistrial when the prosecutor elicited testimony suggesting that Petitioner had used brass knuckles. (*Id.* at 34.)

14. Trial counsel was ineffective for failing to object, seek a curative instruction, and move for mistrial when the prosecutor questioned Sholar about whether anyone at the scene had brass knuckles. (*Id.* at 36.)

15. Trial counsel was ineffective for failing to object, seek a curative instruction, and move for mistrial based on the prosecutor's improper closing argument. (*Id.* at 38.)

<u>Standard of Review</u>

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996). In the course of reviewing state proceedings, a federal court does "not sit as a super state supreme court to review error under state law." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) (citations omitted); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983).

Review of the petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

6

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "By its terms § 2254 bars re-litigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). The AEDPA imposes a "highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation and internal quotation marks omitted).

With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003)). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). As such, "evidence later introduced in federal court is irrelevant." *Id.* at 184. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011).

With respect to section 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citing section 2254(e)(1)). The "standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief." *Id.* (citation and internal quotation

7

marks omitted). The Supreme Court has held that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (citation omitted). The Supreme Court has also explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Federal habeas corpus relief is not available just because a state court decision may have been incorrect; instead, a petitioner must show that a state court decision was unreasonable. *Id.* at 694.

<u>Discussion and Analysis</u>

1. Claim 1 – Right to a Speedy Trial

Petitioner alleges that the state violated her Sixth Amendment right to a speedy trial by waiting until 2018 to try her after indicting her in 2009. (Dkt. #1 at 11–12.) She raised that claim on direct appeal, where the state court of appeals summarized the applicable standard as follows:

> "The Sixth Amendment to the United States Constitution provides, in relevant part, that, '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial.'" *Nguyen v. State*, 506 S.W.3d 69, 77 (Tex. App.—Texarkana 2016, pet. ref'd) (quoting U.S. CONST. amend. VI; *Barker v. Wingo*, 407 U.S. 514, 515 (1972)). "That right was made applicable to the states by the Due Process Clause of the Fourteenth Amendment." *Id.* (citing U.S. CONST. amend. XIV; *Klopfer v. N. Carolina*, 386 U.S. 213, 223–26 (1967)). "The Texas Constitution likewise provides that . . . 'the accused shall have a speedy . . . trial.'" *Id.* (quoting TEX. CONST. art. 1, § 10).

> The right to a speedy trial cannot be quantified in days or months. *Barker v. Wingo*, 407 U.S. 514, 523 (1972). Thus, Texas courts "analyze federal constitutional speedy-trial claims 'on an ad hoc basis' by weighing and then balancing the *Barker v. Wingo* facts." *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). In executing the balancing test, "[t]he court should inquire about (1) the length of the delay, (2) reasons for the delay, (3) the circumstances of the defendant's assertion of the right, and (4) any prejudice that resulted from the delay." *Nguyen*, 506 S.W.3d at 77 (citing *Barker*, 407 U.S. at 530). No one factor is determinative, and all factors must be considered together along with relevant circumstances on a case-by-case basis. *Cantu*, 253 S.W.3d at 281.

> "When reviewing a trial court's decision on a speedy trial claim, an appellate court

8

applies a bifurcated standard of review." *Nguyen*, 506 S.W.3d at 77 (citing *State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999); *State v. Jones*, 168 S.W.3d 339, 345 (Tex. App.—Dallas 2005, pet. ref'd)). "[W]e review legal issues de novo[,] but give deference to a trial court's resolution of factual issues." *Id.* (quoting *Kelly v. State*, 163 S.W.3d 722, 726 (Tex. Crim. App. 2005); *Munoz*, 991 S.W.2d at 821; *Jones*, 168 S.W.3d at 345). "We review a speedy trial claim in light of the arguments, information, and evidence that was available to the trial court at the time it ruled." *Id.* (citing *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003); *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003); *Jones*, 168 S.W.3d at 345). Under an abuse of discretion standard, we defer to the trial judge's resolution of facts and reasonable inferences drawn therefrom, and we review the evidence in a light most favorable to the ruling. *Cantu*, 253 S.W.3d at 282.

(Dkt. #15-14 at 3–5.)

Applying the *Barker* standards to this case, the state court easily found the length of delay involved "weighs heavily in Roldan's favor." (*Id.* at 5.) Turning to the reasons for the delay, the court considered the delay in three separate phases: (1) the time between Petitioner's April 2009 arrest and when both parties announced they were ready for trial in April 2011; (2) the seven-year delay between the ready-for-trial announcement and February 2018 when the trial court issued a capias for Petitioner's appearance; and (3) the period after February 2018 when Petitioner failed to appear for court. (*Id.* at 6–8.) It found that the delay from 2009 to 2011 was attributable to Petitioner's announcement that she was not ready for trial, followed by her changing her mind about pleading guilty. (*Id.* at 7.) With regard to the lengthier second phase, the court observed that Petitioner never asserted her right to a speedy trial during that time but that the state also "offered no justifiable reason for its failure to proceed with Roldan's trial in a more timely manner." (*Id.* at 7–8.) Accordingly, the blame for that stage of delay was shared by both parties but fell mostly on the state. (*Id.* at 8.) And finally, the court held that it was within the trial court's discretion to discredit Petitioner's claim that she did not receive the February 2018 notice to appear, so the delay between February and her September 2018 trial date was attributable to Petitioner. (*Id.*) Taken as a whole, with the state's lack of justification for the "excessive delay," the court found the reasons for the delay weighed in favor of finding a speedy trial violation. (*Id.*)

9

The court next considered Petitioner's assertion of her right to a speedy trial. Again, the court acknowledged that "the State took an excessive amount of time to bring Roldan to trial." (*Id.* at 11.) But it observed that, throughout that time, Petitioner was aware of her indictment and "[d]espite having this knowledge, Roldan failed to move for a speedy trial." (*Id.*) She did not assert her right to a speedy trial "until almost nine years later and just two weeks prior to the commencement of trial, when she filed her motion to dismiss," which, the court found, distinguished her case from one on which she relied—*Doggett v. United States*, 505 U.S. 647 (1992)—in which the defendant was unaware for years that he had been indicted and asserted a violation of his speedy trial right as soon as he learned of it. (*Id.* at 10–11 and n.13.) Accordingly, the state court concluded that this factor weighed heavily against Petitioner. (*Id.* at 12.)

The state court then considered the three aspects of potential prejudice from the delay: (1) pretrial incarceration; (2) anxiety of pending accusations; and (3) impairment of defense. (Dkt. #15-14 at 12 (citing *Barker*, 407 U.S. at 532).) It found that Petitioner was not prejudiced by the five days she spent in pretrial detention and that "it could be said" that the delay actually relieved her anxiety rather than adding to it. (*Id.* at 12–14.) The court observed that Petitioner testified at the hearing on her motion to dismiss that she had been unable to locate two witnesses—the owners of the property where the incident happened—but that she had waited until shortly before trial to try to find them despite knowing of her indictment since "its inception." (*Id.* at 15 and n.16.) Moreover, both those witnesses ultimately appeared and testified disfavorably to her at trial. (*Id.* at 15.) The court concluded that Petitioner's defense had not been impaired by the delay and that the prejudice factor overall did "not weigh in favor of dismissal." (*Id.*)

Finally, the court balanced all four *Barker* factors as follows:

Here, the nine-year delay in the commencement of trial, of which a large portion was

> attributable to the State, weighs in favor of finding that Roldan's speedy-trial right was violated. However, Roldan's contribution to the delay, as well as her tardy presentment of her complaint to the trial court, and then pleading for a dismissal—as opposed to requesting speedy trial—all weigh heavily against her claim. Moreover, other than showing that there had been a negative effect on her personal life due to the pending charge, there was little, if any, evidence to indicate that the delay negatively affected her ability to mount a defense at trial. This is especially true considering that Roldan had been released on bond during the complained-of period of time. We therefore conclude that the trial court did not err in declining to dismiss the indictment.

(Dkt. #15-14 at 15–16.)

Petitioner acknowledges that *Barker* supplies the applicable standard for evaluating Speedy Trial claims. (Dkt. #16 at 49.) The question under AEDPA, therefore, is whether the state court's application of *Barker* to this case was objectively unreasonable. Petitioner contends that it was. (*Id.*) Specifically, Petitioner asserts that the lengthy delay and the state's lack of justification for it "should carry extraordinary weight against the State" and "strongly favors Roldan" in the *Barker* analysis. (*Id.* at 51–52.) She then suggests that she effectively asserted her right to speedy trial in 2011 when she announced that she was ready for trial and that the state's "unexplained extraordinary delay of over seven years" neutralizes her failure "to be persistent in pursuit of a speedy trial." (*Id.* at 53–54.) She argues that the prejudice factor favors her position because she suffered anxiety, loss of sleep, difficulty obtaining employment, and some impact to her defense that she "could not identify precisely." (*Id.* at 54–55.) She repeats her claim from state court that "her defense was hampered because she was unable to locate and serve two important witnesses" without addressing the fact that those two witnesses ultimately testified against her. (*Id.* at 55.) And, citing *Doggett*, she argues that she did not have to identify any specific impact to her defense to benefit from this factor. (*Id.*)

As discussed above, the state court did find that the length of delay and the lack of justification for it weighed in Petitioner's favor in this case. Plaintiff's belief that this warranted much more weight than the state court gave it does not make the state court's analysis objectively unreasonable. The Fifth

11

Circuit has instructed in the context of a speedy trial claim that AEDPA's "always-substantial deference is at an apex when we are reviewing a state court's application of a broad, general standard whose application 'to a specific case can demand a substantial element of judgment,'" and that the *Barker* "balancing test eschews 'rigid rules' and 'mechanical factor-counting' in favor of 'a difficult and sensitive balancing process.'" *Amos v. Thornton*, 646 F.3d 199, 205 (5th Cir. 2011) (citations omitted). "Section 2254(d)(1) thus requires us to give the widest of latitude to a state court's conduct of its speedy-trial analysis." *Id.*

Thus, even if other courts might have weighed the factors differently, the state court is entitled great deference to its reasonable decision to place greater weight on Petitioner's delay in asserting her speedy trial rights and on the lack of prejudice to her defense. *See Searcy v. Jaimet*, 332 F.3d 1081, 1091 (7th Cir. 2003) ("A federal court's deference to the state court's resolution of the issues involved is even more important when such resolution requires the weighing of factors against one another: 'when the constitutional question is a matter of degree, rather than of concrete entitlements, a 'reasonable' decision by the state court must be honored.'"); *Davis v. Kelly*, 316 F.3d 125, 127 (2d Cir. 2003) (holding that state court's balancing was not unreasonable where "[b]alancing the *Barker* factors necessarily requires a court to make discretionary judgments."); *Rashad v. Walsh*, 300 F.3d 27, 45 (1st Cir. 2002) (AEDPA "deference is heightened in a *Barker*-type case, because constructing a balance among the four factors 'is more judicial art than science.'") Because the state court's rejection of this claim was not so unreasonable as to be beyond fairminded disagreement, Petitioner is not entitled to relief on this claim.

2. Claim 2 – State Habeas Process

Next, Petitioner claims that the Panola County court violated her right to due process under the Fourteenth Amendment by failing to file her petition and the order designating issues for factual

12

development in the Court of Criminal Appeals by the June 8, 2020 deadline. (Dkt. 5 at 13.) She says that the Panola County court's late action "triggered the provision of Texas Code of Criminal Procedure § 11.07(c) which states that the failure of the court to act within the allowed 20 days shall constitute a finding that the trial [court] finds that there are no controverted, previously unresolved facts material to the legality of Applicant's confinement," and that the Court of Criminal Appeals dismissed her petition on that basis. (*Id.* at 13–14.)

Respondent asserts that this claim is not cognizable under Section 2254 because any violation of state habeas procedures does not amount to a federal constitutional violation as required for federal habeas relief. (Dkt. #14 at 14.) Petitioner responds in great detail about how the procedural irregularities in her state habeas case violated Texas law "[p]ursuant to Tex. Code Crim. P. Art. 11.07, Sec. 3(c)," which she cites at least three times in this section of her reply. (Dkt. #16 at 8–11.)

But Petitioner does not provide any authority for basing federal habeas relief on alleged errors in state habeas proceedings. To the contrary, the law is well established that such errors do not state a claim for federal habeas corpus relief. *Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984). This is because "an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself." *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001). Accordingly, any claim about alleged errors in the course of a Texas inmate's "Article 11.07 application proceedings is not cognizable on federal habeas review." *Gildon v. Lumpkin*, No. 6:20-CV-00066, 2021 WL 7367125, at *3 (S.D. Tex. Mar. 23, 2021), *report and recommendation adopted*, No. 6:20-CV-00066, 2022 WL 684559 (S.D. Tex. Mar. 7, 2022).

Petitioner also suggests that the anomalies in her state habeas proceedings entitle her to a hearing in this Court on the claims the trial court designated for hearing. (Dkt. #16 at 8.) But the Texas Court of Criminal Appeals obviously found that no hearing was required to deny all her state habeas

13

claims on their merits, and AEDPA requires this Court to defer to that ruling and uphold it to the extent possible. Moreover, the trial court also ultimately concluded that Petitioner's claims lacked merit without the need for a hearing. (Dkt. #15-26 at 47–58.) Accordingly, the Court is not persuaded that the procedural confusion in the state courts' handling of her state habeas petition entitles her to an evidentiary hearing now.

3.  Claim 3 – "Pressured" Statement

Petitioner alleges that she told Panola County Deputy Daniel Smith on April 26, 2009, that she did not want to give a statement and wanted to talk to a lawyer. (Dkt. #5 at 15.) She claims that when two other law enforcement officers "pressured" her to sign a statement on April 29, 2009, they "violated [her] constitutional right to counsel by taking advantage of the gross disparity of knowledge possessed by [the officers] regarding [her] constitutional right to counsel and [her] lack of knowledge of her rights by persisting in obtaining a statement from [her] by telling [her] it would be in her best interest after they had been advised she wanted a lawyer." (*Id.* at 15–16.)

Respondent observes that Petitioner did not object to the admission of the allegedly "pressured" statement at trial. (Dkt. #14 at 15.) The trial court records confirm that Petitioner originally moved on June 23, 2009, to suppress "[a]ny statements obtained from" her on the basis that they were obtained in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. (Dkt. #15-1 at 17–18.) The transcript of the pretrial hearing on September 24, 2018, confirms that Petitioner withdrew that motion. (Dkt. #15-4 at 4.) She also did not object later to admission of the statement or testimony about it at trial; in fact, counsel affirmatively said that the statement's admission was "without objection." (Dkt. #15-5 at 58–60.) And she did not appeal any issue about the trial court's admission of the statement or how it was collected. (Dkt. #15-11.)

Petitioner did not raise this claim until she alleged in her state habeas petition, as ground fifteen,

that "law enforcement personnel pressured [her] to give her statement without her lawyer present by claiming it would be in her best interest which violated [her] constitutional rights." (Dkt. #15-27 at 40.) As explained above, the Court of Criminal Appeals denied Petitioner's state habeas petition without written order. (Dkt. #15-25.) Respondent does not expressly assert that this claim was waived or that it was rejected on that basis, and Petitioner does not address the question of waiver in her reply. (Dkt. #14 at 15; Dkt. #16 at 11–12.) Because neither party directly raises the issue, and the Court of Criminal Appeals denied relief without any discussion, the Court presumes the denial was on the merits of the claim. *Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Respondent argues that, even assuming admission of the statement was constitutional error, Petitioner "fails to show harm by demonstrating the admission of her statement had a substantial and injurious effect on the jury's verdict, especially given the other evidence and her own trial testimony that she beat Adams even though Adams did not take a swing at her first." (Dkt. #14 at 15.) Petitioner replies by going on at length about how the statement was involuntary and says simply that "the prosecution used it against her in obtaining a conviction." (Dkt. #16 at 12.) But she does not discuss the prejudice from the admission of the statement in the context of the rest of the evidence against her, including her own testimony.

The Court agrees with Respondent. A habeas petitioner is not entitled to relief when the alleged constitutional error upon which she relies did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In her statement, Petitioner describes being provoked and encouraged to fight the victim after several attempts to ignore her. (Dkt. 15-9 at 17–18.) She acknowledges getting out of a vehicle to fight the victim:

> Then we started fighting. I did not know I was hitting that hard. I was on top of her and was hitting her in the face with my fist. I stopped when I felt my hand was wet. I really feel bad that I hurt her that bad. I did not know I was at the time.

(*Id.* at 18.) The basic fact that Petitioner beat the victim by getting on top of her and hitting her repeatedly was established by the statements and testimony of several trial witnesses, including Whitney Tyler Bedunah (Dkt. #15-5 at 71–82; Dkt. #15-9 at 27), Brendan Conway (Dkt. #15-5 at 82–106; Dkt. #15-9 at 28), John Sholar (Dkt. #15-5 at 171, 176–77; Dkt. #15-9 at 63), and Petitioner herself. (Dkt. #15-5 at 220–221, 239, 241.) Petitioner has not established—indeed, she has not even asserted—that her statement was more harmful than this other evidence tying her to the beating or that it materially added to the evidence against her.

Because Petitioner cannot prove any prejudice arising from the admission of her statement to police, she is not entitled to relief on this claim. *See Dorsey v. Stephens*, 720 F.3d 309, 318 (5th Cir. 2013) ("Even had the state court unreasonably concluded, within the meaning of AEDPA, that there was no [constitutional] violation, habeas relief could not be granted unless Dorsey proved prejudice.")

4. Claims Four through Seven – Suppression of Evidence

The United States Supreme Court held in *Brady v. Maryland*, 373 U.S. 83 (1963), that prosecutors must disclose evidence that is material and favorable to the defendant, regardless of whether the defense requests it. *Id.*; *United States v. Agurs*, 427 U.S. 97, 106–07 (1976). The prosecutor's duty under *Brady* extends to "any favorable evidence known to the others acting on the government's behalf in the case," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), and includes impeachment evidence. *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

To establish a *Brady* violation, a habeas petitioner must satisfy three elements: (1) the evidence suppressed must have been favorable to the petitioner; (2) the government must have suppressed the

evidence willfully or inadvertently; and (3) the petitioner must have experienced prejudice—that is, the suppressed evidence must have been material. *See United States v. Davis*, 971 F.3d 524 (5th Cir. 2020) (citations omitted), *petition for cert. filed on other grounds*, No. 20-7553 (U.S. Mar. 18, 2021). For suppressed evidence to be material, the petitioner must show "there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). For instance, a *Brady* violation occurs when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Through four separate claims in her petition, Petitioner asserts that the prosecution suppressed: (1) criminal histories of trial witnesses Brendon Conway and Telia Adams (Dkt. #5 at 17–19); (2) law enforcement records, including records about other assaults or fights at the crime scene, photos or videos of the party or of the victim in the hospital, and CPS records reflecting the victim's history of alcohol or drug abuse (*id.* at 19–20); (3) records created or gathered during law enforcement interviews of other party guests (*id.* at 21–22); and (4) the criminal histories and complete contact information of twenty other individuals on the state's second amended witness list. (*Id.* at 23.) Petitioner raised these claims in her state habeas petition, which the Texas Court of Criminal Appeals denied without opinion. (Dkt. #15-27 at 13–20; Dkt. #15-25.)

First, Petitioner alleges that the prosecution suppressed evidence that Brendon Conway, who testified at the 2018 trial, had been convicted of misdemeanor assault in 2010, convicted of a misdemeanor for furnishing alcohol to a minor in 2011, and charged with aggravated assault with a deadly weapon in October 2016, for which she successfully completed a deferred adjudication. (*Id.* at 17–18.) Petitioner asserts that this criminal history could have been used to impeach Conway's testimony and to show a "reasonable basis for Applicant's fear of Brendon Conway and Michelle

Adams supporting her claim of acting in self-defense raising doubts about the guilt or innocence of Applicant." (*Id.*)

But Texas Rule of Evidence 609 provides for impeachment with evidence of a criminal conviction for a crime that "was a felony or involved moral turpitude." Tex. R. Evid. 609(a)(1). Petitioner does not address this limitation on impeachment evidence in her petition except to say that the misdemeanor of furnishing alcohol to a minor was "a crime of moral turpitude because it involves an infringement of the moral sentiment of the community." (Dkt. #5 at 17.) But she does not cite any law to that effect or otherwise support this conclusion, even though she bears the burden of demonstrating a constitutional violation. The trial court explained that none of Conway's prosecutions ended in a felony conviction or a misdemeanor involving moral turpitude, and they would not have been admissible as impeachment evidence at trial under the Texas Rules of Evidence. (Dkt. #15-26 at 50.)

Moreover, Petitioner's fear of Conway was immaterial to her defense for aggravated assault on the victim, Michelle Adams. Nor could Conway's assault charges in 2010 and 2016 have been a factor in any fear Petitioner experienced in April 2009 on the night of the assault. Petitioner suggests that Conway's assault charges would have corroborated Petitioner's testimony that Conway encouraged her to fight the victim, but there was already evidence in the record that party-goers were encouraging a fight (Dkt. #15-9 at 27); in fact, Conway's own statement acknowledged that "[e]veryone wanted them to fight." (*Id.* at 28.) Whether the encouragement came specifically from Conway seems insignificant. Furthermore, Petitioner has not established that being encouraged to fight is a defense to the crime of aggravated assault or that additional evidence corroborating that encouragement would have any likelihood of changing the jury's verdict.

The Court also observes that Petitioner's own theory about Conway's propensity for violence

18

and Petitioner's resulting fear of her establishes the exact *opposite* of an explanation for her assault on the victim: "Brendon 'B.J.' Conway's threat to Roldan was clear, if you touch Michelle Adams, I will attack you." (Dkt. #16 at 21.) Viewed through that lens, additional evidence supporting Conway's alleged "threat," or Petitioner's fear of her, would not have made Petitioner's assault on the victim, who was Conway's friend, seem more understandable or justifiable to the jury. For all these reasons, therefore, the Texas Court of Criminal Appeals could have reasonably concluded that Conway's criminal history was not material or beneficial to Petitioner's case and that there was no reasonable likelihood that its disclosure would have changed the outcome of the trial.

Telia Adams's criminal history was a 2003 charge for theft by check, which was dismissed. (Dkt. #5 at 18.) Petitioner implicitly acknowledges that this old, dismissed charge would not be admissible under Rule 609, but asserts that its disclosure "would have enabled Applicant's lawyer to cross examine Telia Adams in a manner that would open the door to its admissibility." (*Id.*) She does not specify what relevant cross-examination questions might have opened that door. Nor does she explain how a dismissed theft charge would have impeached Ms. Adams's testimony about the victim's well-documented injuries—the bulk of her direct testimony was simply to authenticate and explain the context for photographs she took of her daughter before and after the beating (Dkt. #15-5 at 109–20)— or would otherwise have been helpful to Petitioner's defense. Again, Petitioner has not established that the Texas Court of Criminal Appeals could not reasonably have concluded that Ms. Adams's old, dismissed theft charge was immaterial and raised no likelihood of a different outcome.

None of the other individuals for whom Petitioner alleges the state failed to disclose criminal histories actually testified at trial. Petitioner simply "presume[s]" from their appearance on the prosecution's witness list that they were guests at the party the night of the assault. (Dkt. #5 at 23.) Because these individuals did not give any testimony to impeach, their criminal histories are clearly

19

not material or beneficial to the defense. Petitioner also suggests that the state's failure to provide phone numbers and street addresses for some of these individuals was an attempt to thwart her investigation of the case. (*Id.*) But she does not assert that the prosecution or anyone working with it was in possession of those details or that these individuals' contact information would have led to favorable information for the defense. The Texas Court of Criminal Appeals reasonably rejected Petitioner's *Brady* claim about these individuals.

Plaintiff observes correctly that Deputy Endsley testified at trial that law enforcement had been to the crime-scene property several times before and after the assault in this case and that some of those calls involved other assaults. (Dkt. #15-5 at 53–54.) He alleges that the prosecution suppressed all records of those other law enforcement visits, which would have "enabled the defense to show a pattern of drunken brawls and assaults at the Benitez residence, raising the level of danger for Applicant in support of her claim of acting in self-defense." (Dkt. #5 at 20.) But Petitioner's fearful state of mind as relevant to a self-defense claim would have to be the product of her own knowledge, not of law enforcement records she knew nothing about. There is nothing inherently exculpatory about other fights on other occasions, and Petitioner does not assert that she ever asked for police records about other calls to the scene or that such records would not have been available to her if she sought them.

And finally, Petitioner observes that John Sholar testified at trial that party guests used their cell phones to photograph and/or record video of the fight between Petitioner and the victim and claims that the prosecution did not produce any of that evidence or any witness statements or notes about it. (Dkt. #5 at 21.) But Petitioner does not explain how she could have been surprised by Sholar's testimony, since he was her witness, and the information that "everybody was around with their cell phones taking pictures, videoing the crap" was elicited on direct examination. (Dkt. #15-5 at 152, 177–78.) Petitioner also does not allege that the state ever possessed any photos or videos it did not disclose

or that it had any records of interviews with those potential witnesses that it did not disclose. Instead, she asserts that "it is reasonable to conclude" that such evidence exists and that it is "reasonably believed to be exculpatory and helpful to the defense." (Dkt. #5 at 21–22.) That sort of rank speculation is not sufficient to establish a *Brady* violation. *Hughes v. Johnson*, 191 F.3d 607, 629–30 (5th Cir. 1999) ("Hughes's conclusory *Brady* claim is purely speculative. His allegations on this matter reflect that he has no idea whether there even was an internal investigation, much less whether such an investigation revealed exculpatory facts. Such speculation does not support a *Brady* claim."). Even assuming that Sholar was correct that there was video evidence of the incident, it is just as likely that video showing even Petitioner's version of events—her punching the victim until Petitioner's hands were wet with the victim's blood—would have been damaging rather than beneficial to her case. The Texas Court of Criminal Appeals's rejection of this speculative, unsupported claim was reasonable.

Petitioner has not carried her burden of demonstrating that the Texas Court of Criminal Appeals was unreasonable in its rejection of her *Brady* claims. Accordingly, she is not entitled to relief on any of them.

### 5.  Claim Eight – Prosecutor's Questions About Brass Knuckles

Petitioner claims that the prosecutor committed misconduct that denied her a fair trial by insinuating during her examinations of Deputy Endsley and John Sholar that Petitioner wore brass knuckles during the assault on the victim. (Dkt. #5 at 25–26.) She raised this claim in her state habeas petition (Dkt. #15-27 at 21–22), which was denied by the state courts.

During redirect examination, Deputy Endsley testified that he had investigated many hundreds of assaults over the course of twenty years. (Dkt. #15-5 at 49.) Looking at a photograph of the victim, he testified that he had seen similar injuries before. (*Id.* at 49–50.) Then the prosecutor showed Endsley a photograph of Petitioner's hand, and the following questions and answers were given:

21

Q. In your training and experience and your multiple investigations of assaults, have you ever seen this kind of damage on State's Exhibit 6 done to an individual where the defendant's hand looks like that?

A. No, ma'am. There would normally be skin, broke skin, you know, from bone contact.

Q. Bone contact and tooth contact?

A. Yes.

. . .

Q. In the past, when you've seen damage like State's Exhibit 6 – and let's talk only about a man, you know, inferring this kind of damage like State's Exhibit 6. What have you seen on the hands of the individual that threw the punches?

A. Either very strong bruising or maybe assisting with brass knuckles.

Q. Okay. So if – if this – if this is light bruising, that's inconsistent with State's Exhibit 6? In your opinion and in your training and experience, that would be inconsistent?

A. Right.

(Dkt. #15-5 at 49–52.)

Later, during the prosecutor's cross-examination of Sholar, he testified that he had previously inflicted injuries worse that those sustained by the victim in this case, and that when he did so his hands got "pretty beat up and swelled up." (Dkt. #15-5 at 199–200.) The questions and answers along that line continued:

Q. You're hitting bone and teeth. Are your hands going to get cut?

A. Yes, ma'am.

. . .

Q. Okay. And when you've done worse damage than State's Exhibit 6 to someone, did your hands ever look like State's Exhibit 8?

A. No, ma'am.

Q. How did they look?

A. I had broke bones.

Q. You had broke bones in your hands?

A. Yes, ma'am.

Q. Okay. Anyone have brass knuckles that night?

A. No, ma'am.

22

(*Id.* at 200–02.)

Petitioner argues that the suggestion that she used brass knuckles during the assault was "completely made up in the imagination of the prosecutor" and that by asking these questions the prosecutor "deliberately sought to infect the minds of the jurors with the thought that [she] used brass knuckles . . . because the prosecutor knew it would prejudice the jury towards [her]." (Dkt. #16 at 34.)

The Fifth Circuit has succinctly explained the standard for reviewing a prosecutorial misconduct claim on habeas review:

> "In habeas corpus proceedings, we review allegedly improper prosecutorial statements made during a state trial to determine whether they 'so infected the [penalty phase of the] trial with unfairness as to make the resulting [sentence] a denial of due process.'" *Ables v. Scott*, 73 F.3d 591, 592 n. 2 (5th Cir. 1996) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The statements must render the trial fundamentally unfair. "A trial is fundamentally unfair if 'there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted); *see also Little v. Johnson*, 162 F.3d 855, 861 n. 7 (5th Cir. 1998); *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. . . . Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks and internal citations omitted).

*Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).

Under the AEDPA standards explained above, Petitioner must establish that the state court's denial of a claim on the merits was based on an unreasonable determination of the facts or was contrary to or an unreasonable application of federal law. Petitioner has not carried that burden on this claim. Because the facts concerning the prosecutor's questions are in the transcript and not subject to dispute, Petitioner must rely on federal law to support her position. She cites Texas procedural and professional rules, but she does not cite a single federal case that conflicts with or otherwise discredits the state court's rejection of this claim. (Dkt. #5 at 25–26; Dkt. #16 at 33–36.)

23

Moreover, Petitioner's adamant characterization of the prosecutor's questioning as unethical does not make it so. She repeats that the "tactic" was unfair, but she does not cite anything establishing that the responses elicited by the prosecutor were inadmissible,[1] much less flagrantly unethical. The prosecutor had two witnesses testify, based on their personal experience and observation, that the condition of Petitioner's hands was not what was typical of hands that had inflicted the severe injuries sustained by the victim. Endsley suggested that brass knuckles would "maybe" explain the lack of bruising to the hands, but Sholar denied that anyone at the party had brass knuckles. It is not readily apparent why that circumstantial (and conflicting) evidence was grossly unfair to Petitioner, and she does not cite any case law to support her argument that it was.

And finally, even if the prosecutor's questions were improper, the state court could reasonably have found that there was no reasonable probability that they affected the outcome of the case. The jurors saw photographs and heard testimony about the grievous injuries sustained by the victim, and there was no dispute about the fact that Petitioner inflicted them. Petitioner does not allege that the use of brass knuckles or any other device was an element of the crime for which she was convicted. In fact, she affirmatively acknowledges it was not. (Dkt. #16 at 37 ("Roldan was charged with aggravated assault causing serious bodily injury she was not charged with aggravated assault with a deadly weapon.").) Whether the possibility that she used brass knuckles prejudiced Petitioner's case is at best debatable. In other words, it is not so obvious as to be beyond fairminded disagreement that there is any reasonable probability that the jury was swayed against Petitioner by this testimony.

---

[1]    As Respondent suggested during state habeas proceedings (Dkt. #15-27 at 198), Texas law permits admission of a law enforcement officer's opinion when it is based on his own perception of what he saw or when "his training and experience were sufficient to support a conclusion that he possessed expertise" in the subject matter. *Davis v. State*, 313 S.W.3d 317, 350 (Tex. Crim. App. 2010).

Accordingly, Petitioner has not overcome the deference owed to the Texas Court of Criminal Appeals's rejection of this claim and is not entitled to relief.

6. Claim Nine – Closing Argument

Petitioner next claims that the prosecutor denied her a fair trial during closing argument "by referring to evidence of brass knuckles, a retired surgeon that did not testify, suggesting the testimony of a non-testifying retired surgeon and offering her own testimony." (Dkt. #5 at 27.) She raised these issues in her state habeas petition, which was denied. (Dkt. #15-27 at 85–92.)

The Court has reviewed the transcript of both parties' closing arguments. Petitioner's trial counsel's apparent goal was to convince the jury to convict her of the lesser-included charge of assault rather than aggravated assault by diminishing the evidence of serious bodily injury to the victim. (Dkt. #15-6 at 85–91.) Counsel characterized this as "probably [his] strongest argument." (*Id.* at 85.) He argued that none of the victim's surgeries was actually necessary and asked "where are these doctors to come testify as to these medical records?" (*Id.*) He acknowledged that a records custodian authenticated the victim's medical records, but he repeatedly referred to the records themselves as "just a stack of papers" on which "we can't convict." (*Id.* at 85, 87–88, 90.) And he characterized the photographs of the victim's injuries as "smoke and mirrors." (*Id.* at 87.)

In response to that argument, the prosecutor during final closing said "I could have brought you a surgeon. I could have brought you that retired surgeon, but we have you here because you have your reason and common sense." (Dkt. #15-6 at 92.) She then went on to discuss the contents of the medical records and argued that they supported a finding of serious bodily injury. (*Id.* at 93–95, 97.) She also referenced the jurors' own observation of the victim's condition: "She still has permanent disfigurement here. We saw her. We know this. We know it's a serious bodily injury. You don't need a doctor to tell you that because you've seen it, and you have the medical records to prove it." (*Id.* at

97.) She also referred to the assault in passing as a "near-fatal beating" (*id.* at 93) and said that, based on her own demonstration, it is possible to punch someone "up to 62 times" in a minute. (*Id.* at 96.)

Petitioner has not carried her burden of establishing that the state court's rejection of claims arising from these arguments was unreasonable. Contrary to Petitioner's suggestion, the prosecutor did not inject into her closing the non-existent testimony of any doctor. She did not tell the jury what any doctor might have testified to, or even say that the doctor's testimony would have supported the prosecution's case. She simply told the jurors that a doctor could have been called but was unnecessary, because they were capable of deciding for themselves about the extent of the victim's injuries from the evidence in the record. She then discussed that evidence and the conclusions they could draw from it based on their own common sense. It is not apparent from the record why that argument was improper, particularly in response to the (false) assertion by Petitioner's counsel that the jury could not convict based on the victim's medical records. And even assuming that the prosecutor's reference to the assault as "near-fatal" and her own demonstration of the number of punches that could be thrown in a minute were objectionable, a state court could easily determine there is no reasonable likelihood that they influenced the jury's verdict, in light of the objective proof in the record of the extent of the victim's injuries.

The prosecutor also revisited in closing the possibility that Petitioner used brass knuckles or some other aid during the assault:

> Let's talk a little bit about circumstantial evidence. Remember, I talked to you about circumstantial evidence. You tell me this, how someone can do this much damage, showing State's Exhibit 6, and have your dainty little hands be just as pristine as this. How is that possible? Even John Sholar himself said he's done more damage than this and his hands look worse than that.
>
> Because she had a little help, didn't she? And that's why she left, and that's why she went to the truck. She had something in her hands. I don't know if it was brass knuckles. I don't know if she was wearing rings. I don't know what. But I do know this. You cannot cause this much damage and have your hands look like this. That's reason and

common sense. That's the circumstances I want you to rely on.

(Dkt. #15-6 at 98.) The argument "that's why she left, and that's why she went to the truck" was connected to the trial testimony from the party host that Sholar had not returned with Petitioner to the party at his request (Dkt. #15-6 at 35, 37, 42–43) and testimony from the victim that Petitioner had gone back to the truck to get something before the assault. (Dkt. #15-5 at 150.) Earlier during closing, the prosecutor had already suggested that Petitioner's explanation for leaving and returning to the party, supported by Sholar in his trial testimony but not his contemporaneous statement to authorities, was a fabrication. (Dkt. #15-6 at 91–2.) The disparity between the victim's injuries and Petitioner's hands, combined with the conflicting evidence about why Petitioner left and returned to the party, is precisely what the prosecutor suggested it was: circumstantial evidence from which the jury might infer that Petitioner left to retrieve some item that protected her hand and/or increased the victim's injuries. Petitioner does not cite any law establishing that this circumstantial evidence or the argument based on it was improper.

Moreover, as the Court already observed, there was ample evidence of the extent of the victim's injuries, and there was no dispute about the fact that Petitioner caused them, regardless of her method for doing so. Accordingly, a state court could reasonably conclude that this argument, even if it were improper, did not raise a reasonable probability of changing the jury's verdict.

Petitioner has not established that the state court's rejection of this claim was unreasonable, and she is not entitled to relief on this claim.

7.   Claim Ten – Questions About Sholar's Criminal History

The prosecutor began her cross-examination of Sholar as follows:

Q. You're a felon, correct?
A. Oh, yeah.

Q. In fact, you are also a registered –

[Petitioner's counsel]: Judge, may we approach on that?

THE COURT: Okay.

(Dkt. #15-5 at 179.) There followed a bench conference and a recess to determine whether Sholar's previous conviction for a sexual offense, for which he had been released from prison in 2008, and the fact that he was still consequently registered as a sex offender, were admissible. (*Id.* at 180–87.) The court ruled that the prosecutor would not be permitted to ask Sholar about his sex offender registration, and it was decided that the prosecution would not ask any further questions about Sholar's criminal history. (*Id.* at 185–86.)

During the continued bench conference after the off-the-record recess, Petitioner's counsel moved for mistrial on the basis that "the prosecuting attorney asked the witness was he a registered sex offender." (*Id.* at 183.) The trial judge read the relevant portion of transcript, as it is quoted above, and denied the motion for mistrial. (*Id.* at 184–85.) Petitioner's counsel then moved for a curative instruction to disregard the objectionable information, which the court delivered to the jury upon their return to the courtroom: "Ladies and gentlemen, I am going to instruct you to disregard [the prosecutor's] previous question and the witness's answer." (*Id.* at 187–88.)

Petitioner argues that the prosecutor knowingly attempted to prejudice the jury with this inadmissible information and that "the damage to Mr. Sholar's creditability had been done," resulting in a denial of her due process right to a fair trial. (Dkt. #5 at 29–30.) Petitioner raised this claim in her state habeas petition, which was denied without opinion. (Dkt. #15-27 at 27.)

Petitioner relies on a "ten-year bar of presenting evidence" of a witness's criminal history to assert that Sholar's criminal background was inadmissible. (Dkt. #5 at 29.) But the evidentiary rule on which Petitioner relies is a matter of state law, not a federal constitutional guarantee. *See* Tex. R. Evid.

28

609(b) ("Limit on Using the Evidence After 10 Years"). Alleged misapplications of the Texas Rules of Evidence "do not furnish a basis for federal habeas corpus relief." *Moore v. Quarterman*, 526 F. Supp. 2d 654, 686 (W.D. Tex. 2007). Rather, an evidentiary issue under state law can support habeas relief only when it "violates a specific federal constitutional right or is so egregious such that it renders the petitioner's trial fundamentally unfair." *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). The Texas Court of Criminal Appeals might reasonably have rejected this claim on the basis that it did not implicate a federal constitutional right.

Moreover, even if the prosecutor's questions about Sholar's criminal history implicated the Constitution, Petitioner cannot establish any prejudice with her conclusory insistence that the "instruction did little to cure the prejudice and damage" to her defense. (Dkt. #5 at 30.) The Fifth Circuit instructs that "[a]bsent any evidence to the contrary, we presume that the jury followed those curative instructions" delivered by the court. *Sheppard v. Davis*, 967 F.3d 458, 471 (5th Cir. 2020), *cert. denied sub nom. Sheppard v. Lumpkin*, 210 L. Ed. 2d 837 (May 24, 2021). The state court's rejection of this claim for lack of prejudice, therefore, would also be reasonable. At a minimum, Petitioner has not cited any federal law demonstrating that it was not.

For these reasons, Petitioner is not entitled to relief on this claim.

8.  Claims Eleven through Fifteen – Ineffective Assistance of Counsel

Petitioner claims that trial counsel was ineffective in five instances: (1) failure to move to strike state's witnesses for whom the State did not provide criminal histories (Dkt. #5 at 31); (2) failure to object to the admission of Whitney Tyler's statement, which effectively said that she had heard Sholar was a registered sex offender (*id.* at 33); (3) failure to object, move for mistrial and a curative instruction when the prosecutor elicited testimony from Deputy Endsley about brass knuckles (*id.* at 34); (4) failure to object, move for mistrial and a curative instruction when the prosecutor asked Sholar

about brass knuckles (*id.* at 36); and (5) failure to object and request a mistrial and curative instruction during the prosecutor's closing argument. (*Id.* at 38.) Petitioner raised these same claims in his state habeas petition, which was denied. (Dkt. #15-27 at 29–39.)

Federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. *Id.* at 687. To meet the first prong, Petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As discussed above, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal

30

habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

Petitioner does not explain what made the state court's rejection of his ineffective-assistance claims unreasonable, and nothing before this Court establishes that it was.

The Court addressed the claim that the prosecutor suppressed witness criminal histories above in connection with Claims 4 and 7. As the Court already concluded, the criminal histories of Brendon Conway and Telia Adams were inadmissible and would not have raised a reasonable probability of a different outcome even if they had been admitted. For those same reasons, counsel was not ineffective in connection with those witnesses' criminal histories, and the state court reasonably rejected Petitioner's ineffective-assistance claim based on them.

Here, Petitioner also asserts that the state failed to disclose criminal histories for Whitney Tyler and Chris and Cristal Benitez. (Dkt. #5 at 31.) But Petitioner does not even expressly state that these witnesses had criminal histories to disclose. Nor does she say whether any of those presumed histories would have been admissible or how they would have impacted the outcome of her trial. In the absence of that material information, Petitioner cannot establish that counsel's performance was objectively deficient or that it prejudiced her case. And more importantly, she has not established that the Texas

Court of Criminal Appeals's denial of these claims, absent those critical supporting facts, was unreasonable.

Whitney Tyler's statement to law enforcement, admitted without objection, indicated that she had "heard" the man Petitioner was dating at the time of the assault (now known to be Sholar) was a registered sex offender. (Dkt. #15-9 at 27.) Petitioner argues again that Sholar's conviction was inadmissible because it was more than ten years old and that counsel performed deficiently in failing to object to its admission in Tyler's statement. (Dkt. #5 at 33.) Because counsel objected to this same information during Sholar's cross-examination, and the trial court ruled it was inadmissible, it is at least arguable that the failure to object to that portion of Tyler's statement was an oversight by counsel that constituted deficient performance. In light of the trial court's evidentiary ruling during Sholar's testimony, it seems reasonably likely that an objection to that line of Tyler's statement might have been sustained and resulted in redaction of her statement.

But that does not mean that an objection and possible redaction would have been reasonably likely to change the verdict at trial. Petitioner says that this round-about impeachment of Sholar was prejudicial because he was her "principal defense witness." (Dkt. #5 at 33.) But Sholar did not dispute that Petitioner caused the victim's injuries. He testified that the victim spilled beer on Petitioner without throwing a punch, and that is when Petitioner "got her to the ground" and "started hitting her" and did not stop until Sholar pulled Petitioner off the victim by her hair. (Dkt. #15-5 at 176–77.) Sholar said that "when I finally got her off of her, the damage had done been done." (*Id.* at 178–79.) Accordingly, even if the jurors connected the sex offender boyfriend in Tyler's statement with Sholar, any effect that information had on their assessment of his testimony was infinitesimal compared to the evidence against Petitioner, including the evidence from Sholar himself. A state court's rejection of this claim for lack of prejudice would be a reasonable application of *Strickland*.

32

The Court found above that Petitioner has failed to establish that the prosecutor's questions about the condition of her hands and the possibility that she used brass knuckles in the assault was flagrantly improper. Petitioner's claim that counsel was ineffective for failing to objection to those questions of Deputy Endsley fails for the even simpler reason that counsel did object to that line of questioning. After Endsley testified that a perpetrator's hands would normally have broken skin from bone and tooth contact after a beating like the victim's and that Petitioner's hands exhibited only light bruising, the following exchange occurred:

> Q. Light bruising, okay. Do you have an opinion as to whether or not this hand –
>
> [Petitioner's counsel]: Judge, I'm going to object to offering opinions. He's not an expert witness.
>
> . . .
>
> [Petitioner's counsel]: He's not a doctor, Your Honor. He's not listed as an expert. He's listed as a witness here but not an expert witness. To render an opinion, I would have to subject him to a *Daubert* hearing.

(Dkt. #15-5 at 50–51.) The judge ruled that Endsley could "testify based on just instances in the past of his, but certainly not with respect to this particular incident." (*Id.* at 51.) Accordingly, Endsley testified that in his past cases, the hands of the perpetrator of similar injuries as the victim's exhibited "[e]ither very strong bruising or maybe assisting with brass knuckles." (*Id.*) Endsley's mention of brass knuckles, therefore, was based on his prior work experience and consistent with the trial court's evidentiary ruling, and it came in over counsel's objection. There is no reason to believe that, having tried and failed to bar Endsley's brass knuckles testimony, counsel had any reasonable chance of prevailing on a motion to instruct the jury to ignore it or for a mistrial.

When Sholar testified later, the prosecutor asked if anybody at the fight had brass knuckles, and he said no. (Dkt. #15-5 at 202.) That denial arguably benefitted Petitioner by refuting the suggestion raised by Endsley's testimony, and counsel is entitled to the presumption that allowing this

33

question and answer constituted "sound trial strategy." *Strickland*, 466 U.S. at 689.  Moreover, for the same reasons the Court has already explained, a state court could reasonably determine that none of the references to brass knuckles had any material impact on this case, where it was undisputed that Petitioner caused the victim's injuries and ample evidence that the injuries were severe.

Petitioner claims that counsel was ineffective for failing to take action against the same allegedly improper portions of the state's closing argument that were the basis for Claim Nine above. As the Court already determined in ruling on that claim, Petitioner has not established that the state's closing included improper argument that was reasonably likely to affect the outcome of the trial. Likewise, counsel's failure to object or raise any motion about the argument does not satisfy the prejudice prong of *Strickland*.  Moreover, there is a belief among many trial attorneys that interrupting opposing counsel's closing argument can backfire by drawing more attention to the argument, and the Fifth Circuit has accordingly held that "[a] decision not to object to a closing argument is a matter of trial strategy." *Adams v. Quarterman*, 324 F. App'x 340, 353 (5th Cir. 2009) (quoting *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992)). Petitioner has not overcome the presumption of a competent, strategic decision in this case.

Finally, the Court reiterates that the central question under AEDPA is not whether counsel's performance failed the *Strickland* test, but whether the Texas Court of Criminal Appeals's determination that it did not was so unreasonable that it was "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. This habeas standard for ineffective-assistance claims is "doubly deferential," and "is hard to meet 'because it was meant to be.'" *Anaya v. Lumpkin*, 976 F.3d 545, 557 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2703 (2021) (quoting *Harrington*, 562 U.S. at 102). Petitioner does not satisfy that standard with respect to any of his ineffective-assistance claims and is not entitled to relief under AEDPA.

Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). A district court may deny a certificate of appealability *sua sponte* because the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

To obtain a certificate of appealability, the petitioner must make a substantial showing that the petitioner has been denied a federal right. *Newby v. Johnson*, 81 F.3d 567, 569 (5th Cir. 1996). To do this, he must demonstrate that the issues are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. *James v. Cain*, 50 F.3d 1327, 1330 (5th Cir. 1995).

When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a certificate of appealability should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the prisoner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists reviewing this case could not disagree that Petitioner's claims were either reasonably rejected by Texas courts or are not cognizable as federal habeas claims. Accordingly, the Court should deny a certificate of appealability.

RECOMMENDATION

The undersigned accordingly recommends that a writ of habeas corpus be denied, this action

35

be dismissed with prejudice, and that a COA be denied *sua sponte*.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

**So ORDERED and SIGNED this 21st day of April, 2022.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

36